IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESTES EXPRESS LINES, *Plaintiff,* v. U.S.A LAMP AND BALLAST RECYCLING, INC. D/B/A CLEANLITES RECYCLING, INC., *Defendants.* | Civil Action No. 2:21-cv-609 Hon. William S. Stickman IV |

### MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Before the Court is Defendant U.S.A. Lamp and Ballast Recycling Inc., d/b/a Cleanlites Recycling Inc.'s ("Cleanlites") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (ECF No. 42). Plaintiff Estes Express Lines ("Estes") filed its initial complaint against Cleanlites on May 7, 2021. On November 10, 2022, Estes filed its First Amended Complaint ("Amended Complaint") alleging Negligence (Count I), Common Law Strict Liability (Count II), Strict Liability Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. 9601 *et seq*. ("CERCLA") (Count III), and Strict Liability Pursuant to the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.101 *et seq*. ("HSCA") (Count IV). Presently, Cleanlites "moves to dismiss Counts II, III, and IV, of Estes' Amended Complaint with prejudice pursuant to Rule 12(b)(6)." (ECF No. 42, p. 6).

I.     FACTUAL BACKGROUND

In February 2021, Cleanlites contracted with Estes "to transport approximately 18.6 gallons of mercury, at a weight of approximately 2,100 lbs., from Cleanlites' principal place of business

1

in Cincinnati, Ohio to a mercury recovery, recycling and retirement company in Hellertown, Pennsylvania." (ECF No. 36, ¶ 8). "On or before February 10, 2021, Cleanlites packaged and otherwise prepared for shipping the … mercury [by] plac[ing] the mercury in a reusable metal container, clos[ing] the reusable metal container, plac[ing] the container on a wooden pallet, and then wrapp[ing] the container and the pallet in plastic." (*Id.* ¶¶ 20, 21). "Cleanlites certified that the packaged mercury was properly packaged, properly marked and labeled, and was in proper condition for transportation according to the applicable regulations of the Department of Transportation." (*Id.* ¶ 23). "Estes transported the packaged mercury to its Cincinnati terminal to transfer it from a tractor-trailer permitted for intra-city travel only to a tractor-trailer permitted for interstate travel." (*Id.* ¶ 24). "On February 19, 2021, … Estes transported the packaged mercury from its Cincinnati terminal to its terminal in Eighty Four, Pennsylvania, within Washington County, Pennsylvania, arriving in Eighty Four in the early morning hours of February 20, 2021." (*Id.* ¶ 26). Once in Eighty Four, Estes placed the packaged mercury into a new trailer "for eventual transport to Hellertown, Pennsylvania, via Estes' Allentown, Pennsylvania terminal." (*Id.* ¶ 27). While in the trailer, the container fell on its side and leaked "approximately 6.6 gallons of mercury, at a weight of approximately 751 lbs … contaminating the Estes Eighty Four terminal, including the Estes trailer." (*Id.* ¶¶ 28, 32). The leak was discovered by Estes' personnel on February 24, 2021. (*Id.* ¶ 29). That same day, "Estes hired a company specializing in hazardous material spill response management." (*Id.* ¶ 33). According to Estes, as of the filing of its First Amended Complaint, "[c]leanup at the Eighty Four terminal has continued since the initial discovery of the mercury spill … and is ongoing." (*Id.* ¶ 39).

## II. STANDARD OF REVIEW

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Although a court must accept the allegations in the complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

### III. ANALYSIS

#### A. Count II of Estes' Amended Complaint is dismissed for failing to state a cause of action upon which relief can be granted.

Count II of the Amended Complaint asserts a claim of common law strict liability against Cleanlites. Cleanlites' Motion to Dismiss presents two distinct arguments as to why Count II of Estes' Amended Complaint should be dismissed. First, it argues that Estes' involvement and participation in the transport of mercury means that "Estes itself would be subject to the imposition of strict liability for engaging in an ultrahazardous activity." (ECF No. 43, p. 3). Cleanlites asserts that because Estes is a participant in the activity, it cannot shift "its own liability to another company allegedly engaged in the activity." (*Id.*). Second, Cleanlites argues that "the act of shipping mercury is not an ultrahazardous activity that would permit the imposition of strict liability." (*Id.* at 8). Because the Court agrees that the transportation of mercury is not an abnormally dangerous, ultrahazardous, activity, it need not address Cleanlites' participation argument.

Estes asserts its claim for common law strict liability pursuant to Section 519 of the Restatement (Second) of Torts, which states:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Restatement (Second) of Torts § 519 (1977).[1]

---

[1] Although the Pennsylvania Supreme Court has never expressly adopted the Restatement (Second) of Torts, lower Pennsylvania courts have routinely analyzed the question of whether an activity is abnormally dangerous by applying the provisions of Sections 519 and 520. *See Smith v. Weaver*, 665 A.2d 1215, 1219 (Pa. Super. 1995); *Diffenderfer v. Staner*, 722 A.2d 1103, 1107 (Pa. Super. 1998); *Albig v. Mun. Auth. of Westmoreland Cnty.*, 502 A.2d 658, 663 (Pa. Super. 1985). There

4

Section 520 of the Restatement (Second) of Torts offer considerations for determining whether an activity is abnormally dangerous. It instructs courts to consider the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* § 520. "Whether the activity is an abnormally dangerous one is to be determined by the court, upon consideration of all the factors listed in this Section, and the weight given to each that it merits upon the facts in evidence." *Id.* comment (I). In applying the facts pled in the Amended Complaint to the factors set forth in § 520, the Court finds that the storage and transportation of mercury is *not* an abnormally dangerous activity. In explaining this determination, the Court will analyze each subsection of Section 520.

As to subsections (a) and (b), the storage and transportation of mercury does not constitute a high degree of risk of some harm to the person, land or chattels of others, nor is there a likelihood that the harm resulting from a mercury leak may be great, at least in the manner contemplated by Section 520. The Comments on Clauses (a) and (b) in the Restatement (Second) of Torts were instructive to the Court's determination:

> An activity that is abnormally dangerous ordinarily involves a high degree of risk of serious harm to the person, land or chattels of others. The harm threatened must be major in degree, and sufficiently serious in its possible consequences to justify holding the defendant strictly responsible for subjecting others to an unusual risk. It is not enough that there is a recognizable risk of some relatively slight harm, even though that risk might be sufficient to make the actor's conduct negligent if the

---

is no question that the provisions of the Restatement (Second) addressing strict liability for abnormally dangerous activities adequately summarize Pennsylvania law.

utility of his conduct did not outweigh it, or if he did not exercise reasonable care in conducting it. If the potential harm is sufficiently great, however, as in the case of a nuclear explosion, the likelihood that it will take place may be comparatively slight and yet the activity be regarded as abnormally dangerous.

Some activities, such as the use of atomic energy, necessarily and inevitably involve major risks of harm to others, no matter how or where they are carried on. Others, such as the storage of explosives, necessarily involve major risks unless they are conducted in a remote place or to a very limited extent. Still others, such as the operation of a ten-ton traction engine on the public highway, which crushes conduits beneath it, involve such a risk only because of the place where they are carried on. In determining whether there is such a major risk, it may therefore be necessary to take into account the place where the activity is conducted.

*Id.* Comment on Clauses (a) and (b).

Here, the transportation of mercury on public thoroughfares presents a relatively small risk of harm to persons, land, or chattels, especially in comparison to other activities that are commonplace in our modern industrial society. The examples cited in the Restatement's commentary include the use of atomic energy and, the classic example of activity incurring strict liability—the use, transportation and storage of explosives.[2] These are situations which pose a risk of immediate and substantial, if not catastrophic, harm to those involved and the public at large. Activities will not be deemed to be ultrahazardous if the potential harm is not direct, immediate,

---

[2] *See Exner v. Sherman Power Constr. Co.,* 54 F.2d 510, 513 (2d Cir. 1931) (finding that "the use of dynamite is so dangerous that it ought to be at the owners' risk."); *In re Hanford Nuclear Rsrv. Litig.,* 350 F. Supp. 2d 871, 883 (E.D. Wash. 2004) (finding that "[d]efendants were engaged in an abnormally dangerous activity" when "chemical separation" occurred during a "plutonium production process."); *Bradford Glycerine Co. v. St. Marys Woolen Mfg. Co.,* 54 N.E. 528, 528, 531 (Ohio 1899) (finding that the storage of nitroglycerine is "an extraordinary and unusual use of property" and that "one who stores [nitroglycerine] on his own premises is liable for injuries caused to surrounding property by its exploding, although he neither violates any provision of the law regulating its storage nor is chargeable with negligence contributing to the explosion."); *French v. Center Creek Powder Mfg. Co.,* 150 S.W. 723, 724-725 (Mo. Ct. App. 1913) (finding that the act of storing "a large quantity of nitroglycerin, dynamite, and other explosives" at a powder manufacturing plant "is in and of itself a nuisance per se so far as it affects or damages those in the danger zone, and that regardless of the degree of care exercised by the storer, … if an explosion occurs and injury results … liability attaches.").

and substantial—notwithstanding the exercise of reasonable care in the circumstances. An activity will only be deemed ultrahazardous where it "necessarily and inevitably involve[s] major risks of harm to others, no matter how or where [it is] carried on." *Id.* For this reason, Pennsylvania courts rarely deem an activity to be ultrahazardous and strict liability is rarely implicated. *See Rhoads Indus., Inc. v. Shoreline Found., Inc.,* No. CV 15-921, 2022 WL 742486, *21 (E.D. Pa. Mar. 10, 2022) ("[T]he characterization of an activity as 'abnormally dangerous' in Pennsylvania is extremely rare. If an activity can be performed safely with the exercise of ordinary care, then 'negligence serves both as an adequate remedy for injury and a sufficient deterrent to carelessness and the imposition of strict liability is unnecessary.'" (footnote and citation omitted)).[3]

There is no question that a spill of mercury will require environmental remediation. The cleanup required may be extensive and expensive. Nevertheless, the transportation of mercury simply does not pose the risk of immediate and serious harm that would warrant it to be deemed ultrahazardous. Thus, subsections (a) and (b) weigh against finding that the storage and transportation of mercury constitutes an abnormally dangerous activity.

As to subsection (c), Estes alleges that "any person or entity, including Cleanlites, that packages or otherwise prepares mercury for shipping has a duty to meet packaging and shipping requirements for mercury, which are developed, implemented and enforced by the United States Department of Transportation and which are published under Title 49 of the Code of Federal Regulations." (ECF No. 36, ¶ 14). Indeed, 49 CFR § 173.164(d) states in relevant part: "(d) For

---

[3] *See also Roth v. NorFalco, LLC,* No. CIVA 1:06-CV-01452, 2010 WL 1754618, *8 (M.D. Pa. Apr. 29, 2010), *aff'd,* 651 F.3d 367 (3d Cir. 2011) ("[T]he [Restatement (Second)] factors also indicate that unloading sulfuric acid [from a railcar] should not be considered an abnormally dangerous activity. To begin, the Court finds that factors (a) and (b) balance out one another. The risk of harm caused by sulfuric acid if it is unloaded improperly can be serious, including intense burns to the skin, as [Plaintiff's] injury demonstrates. This weighs in favor of Plaintiffs. However, the risk of such an activity occurring does not appear to be great.")

transportation by other than aircraft, mercury must be packaged— (1) In any packaging which meets the requirements of part 178 of this subchapter at the Packing Group III performance level; or (2) In non-specification reusable metal packagings." 49 C.F.R. § 173.164. These requirements do not indicate that the transportation of mercury is unusually dangerous. Rather, such heightened transportation requirements indicate that the risk posed by the transportation of mercury *can* be minimized or eliminated through the exercise of due care. *See Diffenderfer v. Staner,* 722 A.2d 1103, 1108 (Pa. Super. 1998) (internal citations omitted) (finding that "the risk of storing Thimet [a potentially toxic chemical] can be eliminated with the exercise of reasonable care, and that subsection (c) of § 520 does not support tenant's claim" because (in part) "the federal and state laws regulating the use of phorate require that it be used according to label directions, including storage directions."). Moreover, the transportation of mercury under 49 C.F.R. § 173.164(d) requires conformance with the group III "packing group." "Packing group" is defined at 49 CFR § 171.8 as "a grouping according to the degree of danger presented by hazardous materials. Packing Group I indicates great danger; Packing Group II, medium danger; Packing Group III, minor danger." 49 C.F.R. § 171.8. The relevant federal regulations, therefore, recognize that the transportation of mercury poses only a minor danger. Thus, subsection (c) weighs against finding that the transportation of mercury constitutes an abnormally dangerous activity.

Subsection (d) looks to "the extent to which the activity is not a matter of common usage." Restatement (Second) of Torts § 520 (1977). "An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community." *Id.* Comment on Clause (d). The storage and transportation of mercury is not "carried on by any large percentage of the population." *Id.* Rather, the transportation of mercury is "carried on by only a comparatively small number of persons" and is therefore "not a matter of common usage." *Id.*

Thus, subsection (d) could weigh in favor of finding that the storage and transportation of mercury constitutes an abnormal activity, although the Court does not view this, alone, as indicating that the activity is abnormally dangerous.

Subsection (e) also weighs against finding that the transportation of mercury constitutes an abnormally dangerous activity because there is nothing inappropriate about the place (or, more broadly, instrumentality and associated locations) where the activity at issue was conducted. The mercury in question leaked from its metal container while housed in a trailer awaiting transport to Hellertown, Pennsylvania. (ECF No. 36, ¶¶ 27, 28). The transportation of mercury on public thoroughfares is appropriate given the relatively small degree of risk associated with such an activity. The comment to clause (e) provides examples of activities that are considered abnormally dangerous given the location in which they are carried out. The comment to clause (e) distinguishes between activities carried out in the middle of a city and activities carried out in areas "far from human habitation and all property of any considerable value." Restatement (Second) of Torts § 520 (1977), Comment on Clause (e). For instance, the storage of large tanks of highly inflammable liquid, blasting operations, and storage of magazines of high explosives are all abnormally dangerous activities "if they are carried on in the midst of a city." *Id.* By contrast, if these activities are carried out "far from human habitation and all property of considerable value," the aforementioned activities are not considered abnormally dangerous because they are deemed to have been carried out in an appropriate place. *Id.*

Here, the risks associated with the transportation of mercury are not analogous to any of the examples laid out in the comment on clause (e). This case does not involve the transportation of highly flammable or explosive materials which create—by their very nature—a zone of immediate danger in case of an accident (and resultant explosive or conflagration). Focusing only

on the activity here at issue, the transportation by truck of mercury, the Court holds that there was nothing inappropriate about traveling over open highways and stopping in industrial trucking depots. Thus, subsection (e) of § 520 also weighs against finding that the transportation of mercury constitutes an abnormally dangerous activity.

Likewise, subsection (f), which inquires into the extent to which the activity's value to the community is outweighed by its dangerous attributes, weighs against finding that the storage and transportation of mercury constitutes an abnormally dangerous activity. The comment on clause (f) is instructive. It states in part: "Even though the activity involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one." Restatement (Second) of Torts § 520 (1977), Comment on Clause (f). By transporting mercury to a recovery, recycling and retirement company, Estes engaged in a societally valuable activity—preventing the release of mercury into the environment or other risks associated with inappropriate disposal. The societal value of recycling and/or retiring mercury outweighs the dangers associated with its transportation, which, as explained above, are not the sort that could cause immediate and substantial harm. Here, reasonable care *could* eliminate any risk of harm that the transportation of mercury poses to the public at large. Thus, the Court finds that any danger posed by the transportation of mercury on public thoroughfares is outweighed by its societal value.

The Court concludes that balancing the factors of Section 520 weigh firmly and decisively against finding that the transport of mercury on public thoroughfares is an abnormally dangerous activity. Thus, the Court holds that the transportation of mercury poses an ordinary risk in line with many other risks accepted in our modern industrial society. It is not ultrahazardous. Common

law strict liability does not apply. Thus, the Court will grant Cleanlites' Motion to Dismiss Count II of Estes' Amended Complaint.

### B. Cleanlites' Motion to Dismiss Count III of Estes' Amended Complaint will be denied.

Count III of Estes' Amended Complaint alleges that Cleanlites is subject to strict liability under CERCLA. In Estes' Amended Complaint, it alleges that Cleanlites "arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by Defendant." (ECF No. 36, ¶ 57). Estes further alleges that "[a]s a direct and proximate result of the release of hazardous substance owned or possessed by Defendant, Plaintiff has incurred response costs to contain and remediate the hazardous substance" which was released "[a]s a direct and proximate result of Defendant's actions[.]" (*Id.* ¶¶ 58, 59). Thus, Estes argues that "Defendant is liable to Plaintiff for all damages available under 42 U.S.C. 9601 *et seq.*, including statutory interest from the date of the expenditure concerned." (*Id.* ¶ 61). Cleanlites argues that "the averments of Estes's amended complaint fail to establish its right to recover in strict liability from Cleanlites." (ECF No. 42, ¶ 22). At this stage, the Court finds that Estes has met its burden of pleading a plausible claim against Cleanlites under CERCLA.

Pursuant to CERCLA, liability for the release of a hazardous substance attaches to:

(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
**(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and**
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person[.]

42 U.S.C. § 9607(a) (emphasis added).  Section 9601(14) of CERCLA defines "hazardous substance" as follows:

> The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B) any element, compound, mixture, solution, or substance designated pursuant to Section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D**) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act**, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

42 U.S.C. § 9601 (emphasis added).  Title 40 of the Code of Federal Regulations § 401.15 provides a list of all "toxic pollutants designated pursuant to section 307(a)(1) of [the Federal Water Pollution Control Act]," also known as the Clean Water Act.  40 C.F.R. § 401.15.  "Mercury and compounds" fall within this list.  *Id.*  Thus, mercury constitutes a "hazardous substance" as defined under section 9601(14) of CERCLA.

By its own admission, Cleanlites "engaged Estes to transport a container of mercury to a mercury retirement company." (ECF No. 43, p. 2).  Thus, it is undisputed that Cleanlites "arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of a hazardous substance owned or possessed by Defendant." (ECF No. 36, ¶ 57).  Estes also alleges that Cleanlites "packaged and otherwise prepared [the mercury] for shipping[,]" placed the mercury in its shipping container, "turned over the shipment … to Estes for transport[,]" and "certified that the packaged mercury was properly packaged, properly marked and labeled, and was in proper condition for transportation according to the applicable regulations of the

Department of Transportation." (*Id.* ¶¶ 20-23). Thus, under 42 U.S.C. § 9607(a)(3), liability could plausibly attach to Cleanlites. Further, Estes alleges that "[n]o defenses are available to Defendant pursuant to U.S.C. 9601 *et seq.*"[4] (*Id.* ¶ 60). The Court finds that the four corners of Estes' Amended Complaint pleads a plausible claim for strict liability pursuant to CERCLA. (ECF No. 42, ¶ 21). Whether Cleanlites has a viable defense under 42 U.S.C. 9607(b) is not presently at issue. What matters is that, when taken as true, the facts alleged by Estes in its Amended Complaint "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, Cleanlites' Motion to Dismiss is denied as to Count III of Estes' Amended Complaint.

### C. Cleanlites' Motion to Dismiss Count IV of the Amended Complaint will be denied.

Count IV of Estes Amended Complaint asserts a claim for strict liability under HSCA. Estes pleads that Cleanlites "generated, owned, or possessed a hazardous substance, and arranged by contract, agreement, or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance." (ECF No. 36, ¶ 63). Estes further alleges that "[a]s a direct

---

[4] As to defenses, 42 U.S.C. § 9607(b) states:
> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
> (1) an act of God;
> (2) an act of war;
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
> (4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).

and proximate result of the release of hazardous substance owned or possessed by Defendant, Plaintiff has incurred response costs to contain and remediate the hazardous substance" which was released "[a]s a direct and proximate result of Defendant's actions[.]" (*Id.* ¶¶ 64, 65). Thus, Estes contends that Cleanlites "is liable to Plaintiff for all damages available under 35 P.S. § 6020.101 *et seq.*, including statutory interest from the date of the expenditure concerned." (*Id.* ¶ 67). Cleanlites argues that "Estes utterly fails to aver that the HSCA provides for an action in strict liability and that if it does[,] that right to recover in strict liability flows to Estes against Cleanlites." (ECF No. 42, ¶ 24).

HSCA, like CERCLA, includes mercury in the definition of a hazardous substance. Indeed, HSCA includes mercury in that definition *because* it received that designation under CERCLA. Section 6020.103 of the HSCA defines "hazardous substance" in relevant part, as:

> (1) Any element, compound or material which is:
> (i) Designated as a hazardous waste under the act of July 7, 1980 (P.L. 380, No. 97), known as the Solid Waste Management Act, and the regulations promulgated thereto.
> **(ii) Defined or designated as a hazardous substance pursuant to the Federal Superfund Act.**
> (iii) Contaminated with a hazardous substance to the degree that its release or threatened release poses a substantial threat to the public health and safety or the environment as determined by the department.
> (iv) Determined to be substantially harmful to public health and safety or the environment based on a standardized and uniformly applied department testing procedure and listed in regulations proposed by the department and promulgated by the Environmental Quality Board.

35 P.S. § 6020.103 (emphasis added).

As to possible liability, the statutory language of the HSCA is similar to the language used in CERCLA. Under § 6020.701,

> [A] person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:
> (1) The person owns or operates the site:

14

> (i) when a hazardous substance is placed or comes to be located in or on a site;
> (ii) when a hazardous substance is located in or on the site, but before it is released; or
> (iii) during the time of the release or threatened release.
>
> **(2) The person generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance.**
>
> (3) The person accepts hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release or a threatened release of a hazardous substance which causes the incurrence of response costs.

35 P.S. § 6020.701 (emphasis added).

The Court's analysis regarding the sufficiency of Estes' Amended Complaint as to Cleanlites' liability under § 6020.701 is identical to its analysis of Cleanlites' liability under 42 U.S.C. § 9607(a) of CERCLA. Estes has sufficiently pled that Cleanlites "generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance." *Id.* (*See* ECF No. 36, ¶¶ 20-23, 28, 63).[5]

As with the CERCLA analysis above, the question of whether any of the defenses[6] to strict liability afforded by HSCA are available to Cleanlites is not properly considered at this stage. Estes has pled enough facts to set forth a plausible claim for strict liability pursuant to 35 P.S. § 6020.101 *et seq.*

---

[5] Paragraphs 20-23 of Estes' Amended Complaint describes in detail Cleanlites' methods of packaging and preparing the mercury for transport. Paragraph 28 alleges that "the wooden pallet Cleanlites attached to the reusable metal container failed," causing a release of mercury. Paragraph 63 alleges that "[d]efendant generated, owned, or possessed a hazardous substance, and arranged by contract, agreement, or otherwise for the disposal, treatment, or transport for disposal or treatment of the hazardous substance." (ECF No. 36, ¶ 63). Such factual allegations are sufficient to assert an HSCA cause of action.

[6] In its Amended Complaint, Estes asserts that "[n]o defenses are available to Defendant pursuant to 35 P.S. 6020.101 *et seq.*" (ECF No. 36, ¶ 66).

Cleanlites further argues that Estes' recovery "is specifically limited to contribution" because it too is a potentially responsible party ("PRP") as defined in 35 Pa. Stat. Ann. § 6020.701. (ECF No. 42, ¶ 25). Thus, Cleanlites asserts that "[b]ecause Estes is a PRP under HSCA, the caselaw clearly holds that Estes cannot bring a § 705 cost recovery action against another PRP, such as Cleanlites[.]" (*Id.* ¶ 28). Given the sufficiency of Estes' Amended Complaint, the Court will not determine the merits of Cleanlites' position at this juncture.

Finally, Cleanlites argues that Estes cannot recover against it under HSCA's strict liability provisions because Estes was also a responsible party. Cleanlites cites to *Action Mfg. Co. v. Simon Wrecking Co.,* 428 F. Supp. 2d 288, 336 (E.D. Pa. 2006) for the proposition that "one who transports hazardous substances is a 'responsible party' … [u]nder the HSCA." (*Id.* ¶ 26). Yet the district court in *Simon Wrecking Co.* went on to hold that "[u]nder Third Circuit jurisprudence, to be liable as a transporter, the waste hauler must at least have actively participated in the decision as to where to dispose of the waste generator's waste. *Simon Wrecking Co.,* 428 F. Supp. 2d at 319, *aff'd sub nom. Action Mfg., Co. v. Simon Wrecking Co.,* 287 F. App'x 171 (3d Cir. 2008) (citing *Tippins Inc. et al. v. USC Corp. et al.,* 37 F.3d 87 (3d Cir. 1994)). Although this holding pertained to CERCLA rather than the HSCA, the *Simon Wrecking Co.* court also addressed liability under the HSCA, holding that "[the Defendant's] liability is no different or greater under the HSCA than it is under CERCLA" because "[t]he HSCA 'is Pennsylvania's version of CERCLA and was in fact modeled after the federal statute.'" *Id.* at 336 (*quoting Two Rivers Terminal, L.At v. Chevron USA, Inc.,* 96 F. Supp. 2d 432, 443 (E.D. Pa. 2000)). Given that "the provisions of the HSCA are generally construed to be coterminous with the parallel provisions of the CERCLA," it stands to reason that the active participation requirement under CERCLA is applicable here. *Trinity Indus., Inc. v. Greenlease Holding Co.,* 35 F. Supp. 3d 698, 720 (W.D. Pa. 2014), *aff'd,* 903

F.3d 333 (3d Cir. 2018) (citation omitted). To hold otherwise would create significant disparities between the HSCA and CERCLA. Thus, the question of whether Estes actively participated in deciding where to dispose of Cleanlites' mercury must be fleshed out in discovery. After discovery concludes, Cleanlites will have the option to put forth its arguments anew in a motion for summary judgment. Accordingly, Cleanlites' Motion to Dismiss Count IV will be denied.

### IV. CONCLUSION

Defendant Cleanlites' Motion to Dismiss will be granted in part and denied in part. An Order of Court will follow.

BY THE COURT:

_4-20-2023_
DATE

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE